242 N.J. Super. 121 (1990)
576 A.2d 42
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RICHARD CHILDS AND SUPREME NEWARK, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 1990.
Decided July 3, 1990.
*124 Before Judges BRODY, MUIR, Jr. and SKILLMAN.
Leslie F. Schwartz, Deputy Attorney General, argued the cause for appellant (Robert J. Del Tufo, Attorney General, attorney; Leslie F. Schwartz, of counsel and on the brief).
*125 David A. Ruhnke argued the cause for respondent Richard Childs (Ruhnke & Barrett, attorneys; David A. Ruhnke, on the brief).
No brief was filed on behalf of respondent Supreme Newark, Inc.
The opinion of the court was delivered by BRODY, J.A.D.
The State appeals from an order in which the trial judge dismissed this three-count State grand jury indictment charging thefts, on the ground that a deputy attorney general infringed upon the grand jury's independent judgment. The judge also dismissed the first count of the indictment on the ground that it is duplicitous. We reverse because in our view the deputy attorney general's conduct did not infringe upon the grand jury's independent judgment and because N.J.S.A. 2C:20-2b(4), which permits aggregating the amounts involved in thefts committed pursuant to one scheme or course of conduct, saves the first count from being duplicitous.
The indictment charges defendant Richard Childs (defendant) with deceptive fund-raising activities for Supreme Newark, Inc. (corporation), a corporation he owned and controlled.[1] Our recitation of the facts assumes, solely for the purpose of this appeal, that the testimony given before the grand jury is true.
The corporation operated several stores that sold furniture on credit to poor people. The typical mark-up was 300%. The corporation factored the credit paper, with recourse, to two commercial factors at substantial discounts.[2]
*126 Although the total amount of furniture sales was high and the stores were busy, the corporation always operated at a loss because the uncertain long-term credit payments of its customers did not enable it to meet the insistent short-term credit demands of the factors.
In order to raise cash for his corporation, defendant borrowed money by continually issuing short-term unsecured notes of his corporation, bearing high interest, to an ever widening circle of friends and friends' relatives and friends. Noteholders could, and many did, allow the notes to "roll over" as they matured. Defendant made the notes more attractive by assuring prospective holders that they could demand repayment of all or part of their loans at any time without penalty. Holders frequently took advantage of this feature thereby increasing the drain on the corporation's meager cash reserves. Defendant further induced prospective noteholders to lend the corporation cash by making false representations that the notes were rated AAA, that the corporation was profitable, that its debts were no greater than its liquid assets, that Seton Hall University was a major investor and that the noteholders would somehow be protected by insurance.
Count One of the indictment charges that "between on or about January 1, 1982 and on or about August 31, 1984" defendant used these misrepresentations to commit thefts by deception from twenty named noteholders, totalling an aggregate of $319,605, a second-degree crime. N.J.S.A. 2C:20-4; N.J.S.A. 2C:20-2b(1)(a). Although the indictment does not state each noteholder's loss, it appears from the grand jury minutes that each lost between $500 and $75,000 so that each theft, unaggregated, was a third-degree crime. N.J.S.A. 2C:20-2b(2)(a).
Charles Provini, defendant's former associate in an investment business, and his wife, Susan, were another source of cash for the corporation. Defendant persuaded the Provinis to factor what he represented to be the corporation's better credit *127 paper. He assured the Provinis that the corporation would segregate the paper for them and collect customers' payments. The Provinis formed a corporation, Chalis, Inc., which conducted these factoring transactions for over a year and a half. As he had with the noteholders, defendant assured the Provinis that they could withdraw their cash at any time, and Chalis made withdrawals from time to time. Contrary to his representations to the Provinis, defendant was factoring all the corporation's credit paper of value to the commercial factors, leaving none for Chalis.[3]
Count Two of the indictment charges that "between on or about April 7, 1982 and on or about January 4, 1984" defendant deceived Chalis, Inc. by misrepresenting that it was factoring credit paper that in fact did not exist, thereby unlawfully stealing from Chalis an aggregate of $328,082.86, a second-degree crime.
Count Three, the last count of the indictment, charges that defendant forged Charles Provini's name on a guarantee, a violation of N.J.S.A. 2C:21-1a(2).
Defendant's financial bubble burst when Charles Provini asked to withdraw some of his money and learned that defendant's corporation had neither cash nor credit paper to give him. When defendant was unable to attract more noteholders, the commercial factors forced his corporation into bankruptcy.

I

A
We first consider whether the trial judge correctly dismissed the indictment because the deputy attorney general *128 allegedly pressured the grand jury to return it. An indictment may not be dismissed except on the clearest and plainest grounds. State v. Murphy, 110 N.J. 20, 35, 538 A.2d 1235 (1988). Unless the deputy's conduct before the grand jury infringed upon its decision-making function, it may not be the basis for dismissing the indictment. State v. Vasky, 218 N.J. Super. 487, 491, 528 A.2d 61 (App.Div. 1987); State v. Schamberg, 146 N.J. Super. 559, 564, 370 A.2d 482 (App.Div. 1977), certif. den. 75 N.J. 10, 379 A.2d 241 (1977).
This was not a simple case to present to the grand jury. As defendant correctly notes in the introduction to the arguments in his brief:
The grand jury which returned this indictment heard evidence from a total of 23 witnesses over seven separate sessions. The transcript of grand jury proceedings runs approximately 530 pages. Hundreds of documents were moved into evidence.
Most of this evidence was presented to enable the jury to understand the complexities of the financing arrangements pertinent to the web of deceit that defendant is charged with having spun. In the usual criminal case, evidence presented to a grand jury is easy to follow and speaks for itself. Here, however, the grand jury needed guidance if it was to follow defendant's financial machinations, be able to distinguish fraud from breaches of contract and be able to see the manner in which individual thefts were part of a single criminal venture.
In order to help the jury follow the evidence, the deputy began the first session with a statement that was similar to a prosecuting attorney's opening statement at trial. He outlined the evidence he expected to produce. As witnesses were called, the deputy sometimes explained to the jurors in advance what he expected the witness to say and how that testimony fit into the total picture. He sometimes commented after a witness's testimony about how it was significant to the total picture.
Recognizing that jurors might mistakenly treat his explanations as evidence, the deputy forcefully and repeatedly impressed upon them throughout the proceedings that his statements *129 were not evidence and that the jurors had the responsibility of deciding for themselves what the evidence meant and whether it was sufficient to return an indictment.
We have said that in presenting a case to a grand jury, a prosecutor may not "express his views on questions of fact." State v. Hart, 139 N.J. Super. 565, 567-568, 354 A.2d 679 (App.Div. 1976). However, without expressing his personal views on questions of fact, a prosecutor may fairly explain the significance of evidence placed before the grand jury to aid its understanding of a complex or unfamiliar course of events. Here the deputy's statements and the perceptive questions and comments of grand jurors demonstrate that he did not cross the line that separates proper explanations of the evidence from improper expressions of defendant's guilt that would cause the jurors to abdicate or lose sight of their responsibilities.

B
The trial judge also concluded that the deputy infringed on the grand jury's independence when he made it clear that he did not want the jury to indict certain of defendant's alleged cohorts who had been granted immunity, and certain noteholders who may have received cash preferences when they tried to recoup a small part of their losses. Although the deputy discouraged the grand jury from indicting these people, his decision not to seek an indictment against them is not an infringement of the grand jury's independence.
A prosecutor has broad discretion, which "includes both the decision to prosecute an individual whom he has probable cause to believe has violated the law, and the converse decision to refrain from prosecuting any such offender." State v. Hermann, 80 N.J. 122, 127, 402 A.2d 236 (1979). See State v. Winne, 12 N.J. 152, 174, 96 A.2d 63 (1953). Although that discretion is not boundless, it may only "be reviewed for arbitrariness or abuse." In re Investigation Regarding Ringwood Fact Finding Comm., 65 N.J. 512, 516, 324 A.2d 1 (1974).
*130 It appears that the attorney general did not seek an indictment against certain of defendant's alleged criminal partners in order to obtain from them evidence against defendant that may be used in this prosecution. As to the noteholders who may have received preferences, he could have believed that they had not committed a crime and, even if they had, that it would not be just to prosecute them for their desperate efforts to recoup a small portion of their losses. We find no abuse of prosecutorial discretion in making these judgments, and we would be overstepping our authority to dismiss this indictment in order to pressure the attorney general to exercise his discretion differently.
Even if there were a basis for considering that the deputy improperly infringed on the grand jury's independence when he discouraged it from investigating whether others may have committed crimes, defendant would not thereby be entitled to a dismissal of the indictment against him. An important function of the grand jury is "to protect individuals against arbitrary, oppressive and unwarranted criminal accusations." State v. Porro, 152 N.J. Super. 179, 184, 377 A.2d 909 (App.Div. 1977). Here the grand jury unquestionably performed that function in weighing the evidence respecting defendant's guilt. There is therefore no reason why the indictment of defendant should be dismissed even if the prosecutor improperly discouraged the grand jury from investigating whether to indict others. Defendant does not claim that by seeking an indictment against him, the attorney general engaged in unconstitutional invidious and arbitrary law enforcement. "The mere fact that a law has not been fully enforced against others does not give a defendant the right to violate it." State v. Boncelet, 107 N.J. Super. 444, 453, 258 A.2d 894 (App.Div. 1969). See also State v. Savoie, 128 N.J. Super. 329, 337, 320 A.2d 164 (App. Div. 1974), rev'd on other grounds, 67 N.J. 439, 341 A.2d 598 (1975).

*131 II
Defendant contends that multiple crimes are charged in Count One and in Count Two of the indictment and therefore those counts must be dismissed as duplicitous. The trial judge agreed with respect to Count One and did not discuss the contention respecting Count Two. The State argues that each count charges but one crime because the thefts referred to in each count were "committed pursuant to one scheme or course of conduct" and therefore may be treated as one, pursuant to N.J.S.A. 2C:20-2b(4).
The pertinent portions of N.J.S.A. 2C:20-2b(4) provide:
The amount involved in a theft shall be determined by the trier of fact ... Amounts involved in thefts committed pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of the offense.
The amount involved in a theft is not simply a sentencing factor, but is an element of the crime that must be determined by the grand jury and the finder of fact at trial. See State v. Vasky, 218 N.J. Super. 487, 491, 528 A.2d 61 (App.Div. 1987). Where it applies, the statute permits a grand jury to charge a single second-degree theft by aggregating the amounts involved in separate lesser thefts. By enacting the statute the Legislature has recognized that whether a thief is petty or grand may be measured by the total amount involved in a single larcenous venture and not simply by the amount involved in each of its lesser constituent thefts.
Before aggregating the amount involved in two or more thefts, the finder of fact must first determine whether the thefts are constituent parts of a single scheme or course of conduct. This threshold determination is an element of an aggregated theft crime. Where the evidence could support either conclusion, the indictment may charge the aggregated theft in one count and each lesser theft in separate counts. In such a case, a trial judge would have to charge the jury that if the defendant is guilty of any thefts, it must determine which, if any, were part of a single scheme or course of conduct and *132 which were not. Here the grand jury charged defendant in two counts with two second-degree aggregated thefts and did not charge him separately with the lesser constituent thefts. Therefore as to each count, if the jury does not find that defendant committed at least two thefts pursuant to one scheme or course of conduct, it can find him guilty of no more than one unaggregated theft under that count.
Where an indictment contains one or more counts of aggregated thefts and also contains separate counts for each allegedly constituent theft, the trial judge should instruct the jury to return a verdict for every count, and to indicate with respect to each allegedly constituent theft whether it was part of the scheme or course of conduct charged in a particular aggregated-theft count. The usual form of verdict sheet will have to be modified to allow the jury to report this additional finding.
Where, as here, the indictment charges only aggregated thefts, the judge should instruct the jury in the same manner and use the same kind of verdict sheet as where the constituent thefts are charged in separate counts. The judge should explain to the jury, however, that even though it may be satisfied beyond a reasonable doubt that the defendant committed one or more of the allegedly constituent thefts, its guilty verdicts respecting those thefts will not result in separate convictions, but will provide the information necessary to determine which thefts, if any, the jury aggregated as part of a particular aggregated theft.
The trial judge deemed Count One duplicitous because she mistakenly viewed it as charging defendant with committing more than one theft. To avoid duplicity, "separate and distinct offenses cannot be charged in the same count of an indictment." State v. New Jersey Trade Waste Ass'n., 96 N.J. 8, 21, 472 A.2d 1050 (1984). However, as we have discussed, the third-degree thefts referred to in Count One are not charged as separate and distinct offenses. They are elements of the single *133 aggregated second-degree theft charged in that count. As the Court said in Trade Waste, a count of an indictment charging a single conspiracy is not duplicitous even though it refers to several separate and distinct criminal objects of the conspiracy. Id. at 22, 472 A.2d 1050.

III
Although the State's evidence at trial may fall short of establishing that defendant's alleged thefts were committed pursuant to the schemes or courses of conduct charged in Count One and Count Two, there was sufficient evidence presented to the grand jury to sustain those two counts of the indictment.
As to the thefts from noteholders alleged in Count One, the statute expressly provides that thefts from "several persons" may be aggregated. The grand jury could have found that the thefts were part of "one scheme" to defraud two or more of the noteholders even though the victims may have been unaware of one another and were not deceived simultaneously. There was evidence that by various deceptive stratagems defendant persuaded the noteholders to believe that they would receive a generous return on safe investments in his corporation and that they could withdraw all or part of their investment at any time. That alone, without some connection among the thefts, might arguably constitute no more than using the same modus operandi with several victims. However, a trier of fact could find, for instance, that the connection was defendant's use of cash that he obtained from the ever growing number of noteholders to fund the cash withdrawals of others.[4]
*134 As to the thefts from Chalis, Inc. alleged in Count Two, the grand jury could have found that under the statute they were part of one "course of conduct" whereby Chalis was defrauded by false representations that its repeated investments on a single account were secured. See State v. Tyson, 200 N.J. Super. 137, 490 A.2d 386 (Law Div. 1984) (repeated fraudulently induced welfare payments treated as a single course of conduct).

IV
Defendant argues that some of the thefts charged may not be prosecuted because of the bar of the five-year statute of limitations. N.J.S.A. 2C:1-6b(1). However, N.J.S.A. 2C:1-6c provides:
An offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated. Time starts to run on the day after the offense is committed.
Thefts aggregated pursuant to N.J.S.A. 2C:20-2b(4) constitute a single theft. It follows that a theft may be considered a constituent theft so long as the indictment for the aggregated theft is returned within five years after the last constituent theft was committed.
Reversed and remanded for trial.
NOTES
[1] The indictment charges both defendant and Supreme Newark, Inc. with crimes. The corporation, however, has not participated in any proceedings.
[2] The right of recourse gave the factors the right to demand the substitution of "good" credit paper for "bad."
[3] Charles Provini testified that he usually invested in futures where traders accept one another's word and therefore never verify the existence of the contracts that they are buying and selling. He testified that he similarly accepted defendant's word and therefore never verified whether the credit paper being factored existed.
[4] Such a scheme is similar to a "Ponzi" scheme defined in Application of Matthews, 94 N.J. 59, 64, 462 A.2d 165 (1983):

In this type of scheme, no investment [by the promoter] is ever made. Instead, the promised returns for the first set of investors are paid from the proceeds garnered from a second set of investors. The second set of investors is then paid off with the funds deposited by a third set of investors, and so on. At each step of the process, the promoter takes a sizeable cut as pure profit. The scheme creates irresistible pressure to bring in additional investors with ever greater amounts of money, and eventually collapses of its own weight when the supply of fresh investors dries up.